Good morning, Your Honors. Douglas Benidon for Appellant Bonnie Samuels. This case arises from an alleged retaliatory termination of my client, Ms. Samuels, by the defendant UBS, after she complained to management of sexual and age discrimination. Because there are tribal issues on both causation and pretext, the summary judgment granted in favor of UBS in this case must be reversed. First on the issue of causation, that is one of the elements of Ms. Samuels' prima facie case in a retaliatory discharge case. The first two elements, protected activity and adverse employment action, are both undisputed. Obviously in this case we do not have direct evidence of causation. Nobody at UBS is going to say that they terminated Ms. Samuels based on her prior complaint of discrimination. However, as this Court has recognized, this element may be established through circumstantial evidence. In fact, there are three specific areas of circumstantial evidence that this Court and others have recognized for establishing causation, the first being the temporal proximity between the complaint of discrimination and the adverse employment action. Here we have a period of three months. Well, let me ask you this. I think it's somewhat crucial, but the person who did the discharge was named LaVoice. Correct. And I read the briefs and there seems to be some confusion. Your client was fired, as I understand it, in the afternoon. Is that correct? That is correct, Your Honor. And did your client testify that she gave LaVoice information that morning that she was going to file a complaint or that she had previously filed a complaint? She gave information to LaVoice that morning that she had previously filed a complaint and that the investigation of her alleged misdeeds at work were, in fact, retaliation for the prior complaint. In fact, before she was fired, LaVoice knew about her prior complaint and LaVoice knew that she felt that the reasons for her discharge were related to the prior complaint and retaliatory. LaVoice, as I understand it, disputes any knowledge. Yeah, I know that, but we're on a summary judgment basis, so we want to know the facts as you have them. The facts as we have them are that the morning prior to her discharge, she advised LaVoice of both her prior complaint and her belief that the present investigation was itself in retaliation for her prior complaints. And that LaVoice knew of the December 02 complaint? Correct, Your Honor. All right. In addition to the ---- Who testified to that? That is, there's circumstantial evidence of creating a conflict on that point, Your Honor. What is the circumstantial evidence that creates a conflict? First is, as Justice Breyer pointed out, the fact that that morning she advised LaVoice that she had made a prior complaint. And he testified in his deposition that that's the first he heard of that? Correct. Now, what is the evidence that shows that that's not true? Okay, there's also the evidence that he replaced one ---- he was employed one week earlier to replace a Mr. Harberson who was Ms. Samuels' direct supervisor and to whom Ms. Samuels had made her complaint of discrimination three months earlier. What is the evidence that LaVoice knew prior to that morning about the prior complaint? The evidence is that the knowledge of the prior supervisor should be imputed to Mr. LaVoice. They're filling the same position. They should have the same responsibilities. And the result of saying LaVoice can now basically claim no knowledge of her prior personnel record ---- So you're saying that he had no knowledge prior to that morning, but we have to impute to him that he did have knowledge? We are arguing both. We're saying he had actual knowledge based on her advising him that morning and also the imputed knowledge. Correct, Your Honor? Well, the question I'm asking you about is what is the evidence that he knew prior to that morning? Prior to that morning, there is no evidence that he had direct knowledge. He's claiming he did not. We're saying he had imputed knowledge, Your Honor. Okay. I apologize for the confusion. I also think it's important to point out in that respect that the decision to terminate Ms. Samuels, also there's evidence that that came from UBS itself, from the corporate headquarters in Weehawken, New Jersey, based on LaVoice's own testimony at deposition. If that, in fact, is the case, certainly the corporation must be imputed with the knowledge of not only Harbison, the prior supervisor, but the two other management employees to whom Ms. Samuels had made her prior complaint. Well, is there anything Quinto, the human relations manager, participated in the investigation with LaVoice? Is that correct? That is correct, Your Honor. And, of course, Quinto knew of the prior complaint. He did, Your Honor. He was one of the management to whom Ms. Samuels made her complaint. That is correct. And he did participate in the subsequent investigation. So even if LaVoice didn't have knowledge, Quinto certainly did. Was he involved in the firing? He was involved in the investigation that led to the firing, Your Honor. Who made the decision to fire her? There's dispute on that, Your Honor. Mr. LaVoice testified at one point that he made the decision, but he also testified that the decision came from corporate headquarters. Anybody in corporate headquarters in specific? No, he identified, in fact, he said Weehawken, which is a city in New Jersey, as we pointed out in our brief. Let me ask this. On that complaint she made in December of 2002, she did get a pay raise, right? She did get a pay raise, Your Honor. Correct. So even if you impute to LaVoice the knowledge about Samuels' earlier complaint about her pay was too low, and then the company that went ahead and raised her wages, now why would this give UBS a reason to want to get rid of her? She had a complaint, and they raised her wages, and they thought she deserved more pay, and so she got it. So once they took care of her, what reason would they have for them wanting to get rid of her? Again, Your Honor, we're arguing inferences that can be drawn from the evidence. Give me the reasonable inferences. The reasonable inference is they paid her to shut her up because they knew if they fired her then that they were going to have a lawsuit on their hands. Instead, they waited, and they waited for an opportunity to fire her under the pretext of a disciplinary action. And that's what I would argue to a jury, Your Honor. Well, you're tenuous, I think. No, I don't. I don't think it's tenuous. And I certainly would urge this Court not to weigh the weight of the evidence at this point, at this procedural juncture on summary judgment. If there's an inference that can be drawn that this was a retaliatory discharge, then that's the inference that must be drawn. And the fact that they placated her at that moment and then waited does not ---- It's just the way things turned out, you're saying. We have evidence that she was given the raise she requested, and then three months after making her complaint, she was terminated. And based, again, Your Honor, we are somewhat hampered by the fact we don't have any direct evidence of somebody at UBS saying, we fired her because of that complaint. But we do have the temporal proximity of three months. Well, that's what you got. In addition to that, we have an exemplary employment history of 11 years with no prior disciplinary action. And we have her termination by the people that were involved in the prior complaint, both Mr. Quinto and Mr. LaForte. Well, what the company was unhappy with that spanked was that they made these calls to the actor, Michael Douglas. Is that right? That was the stated reason for Ms. Samuel's termination, Your Honor. Correct. And that gets to the second prong of my argument, which is the ---- But that call was made, wasn't it? The call was made. The records from the company show the call was made. The question is, what was Ms. Samuel's participation in that call? And also, was she disciplined more severely than the other participants in that call in retaliation for her prior complaints of discrimination? What case are you relying upon for imputing the knowledge that Mr. Haberson had? That is the case of First National Finance Corporation against Five-O Drilling Company, cited in our reply brief at page 9. That's a California Supreme Court case. We also cite the ---- we distinguish the case of Cohen against Fred Meyer, which is the case relied on by the appellees. That's also at page 9, and the site is 686F2nd, the jump site 795-96. That's also discussed at page 10. And the distinguishing fact in Cohen is you could not have lower-level management imputed with knowledge that was given to a vice president. Here we have a manager assuming the exact same position as the prior manager of the corporation. And the problem with saying that Lavois can now claim no knowledge, imputed or actual, is it turns out to be a bit of a corporate shogun. They have an employee they want to get rid of. Rather than using Lavois, they bring in someone from the outside and claim, okay, here's someone who's brought in purportedly with no knowledge of the prior discrimination. We can use him to terminate her because then we can say he didn't even know about it. Well, if it was fired one person and put another person in. I don't know if he was fired or transferred. We don't know what happened to Lavois. You're not saying that they hired Lavois as a manager so as to get rid of your client, are you? All I think is far-fetched. And you don't need to argue that because your client testified that she knew about it before Lavois fired her. So why do you have to worry about imputed knowledge when at least you can argue to the jury there was direct knowledge? Because we have both, Your Honor. Okay. I have nothing else to add. Thank you, Your Honor. Good morning, Your Honor. May it please the Court. My name is Melinda Reichert. I'm with the law firm of Morgan, Lewis, and Barkeas, and I represent UBS, the appellee, and the defendant in this case. Does the Court have any preliminary questions for me? If not, I will. Well, yes. Tell me what UBS does. Are they a broker of some kind? Correct, Your Honor. Do you remember Payne Webber? UBS acquired Payne Webber. Yes, I remember Payne Webber because it originated up in my home state. Perfect. Then UBS acquired Payne Webber. I hope you won't hold that against them. So, yes, they're a brokerage. They do high net worth people, give them advice, have their accounts for them, like Smith Barney and other people like that. You're not from Australia, are you? No. I'm sorry to say I'm from London, England. Okay. All right. But I've lived here since 1973, so the English think I speak like an American, the Americans think I speak like an English, so I'm sort of stuck somewhere in the middle of the Atlantic Ocean on my accent. I get a hard time from my relatives when I go back to England. Well, but it sounds more to me like Australia, New Zealand, or... People often say that. South Africa? South Africa, yes. Exactly. That's another one. Somebody once thought I was from Texas. That's about as far wrong as you can go. From where? Texas. They thought I was from Texas. More people think I'm from Boston. Yeah, it's close to Boston. More close to Boston. All right. Boston's close to New Orleans, you know that. Well, I don't know about that. I have a hard time understanding some of those New Orleans. I was down there not too long ago. Well, the first thing I want to ask you is this. When she made her first complaint, which was the prior December, was it? Correct. It must have been a pretty valid complaint because the company really jumped. They gave her a $12,000 raise, and then they gave her a $25,000 bonus in April. Is that correct? It was a valid complaint that she was underpaid. Well, that's what I'm saying. It was a valid complaint. There was discrimination. Well, there's at least an inference that there was discrimination. They say, well, we weren't paying her enough. They didn't need a complaint to do that. So what I'm looking at and want you to respond to is here is a, if I take your position, she's a well-paid, very valuable employee, and there's some question about her participation. The company takes the word of two people who clearly said they were involved, and they bring her in also, and she's the only one, the most valuable employee, the highest-paid employee. She gets fired. The others don't. Isn't that a pretty strong inference that it goes back? They wanted to get rid of her because she was a troublemaker and wanted more money and made a complaint about discrimination. Let's see if I can take all those in turn. That's only one question, but go ahead. I might object that it's compound, but I wouldn't dare do that. So she did complain in December that she was underpaid. The reason she made that complaint was because somebody who was working for her, who was male and under 40, was being paid more than her. And rightfully so, she resented the fact that somebody who was working for her was earning more than her. So the company looked at her complaint and looked at it from two standpoints. One, was she being paid enough? And two, was it because she was female and over 40 that she was being paid less? They looked at all the other people who were being paid who were comparable to her. They found that it made no difference whether you were a woman and no difference how old you were. Most of the people who were paid more than her were women, and people who were paid more than her were older. So it wasn't based on race, I mean, on sex, and it wasn't based on race. That in the record? That is all in the record, correct. Okay. That was the original investigation that was done in connection with that complaint. But they also concluded that, indeed, she was being underpaid. She was within the range for her position, but she was at the bottom of that range. They were going to raise her pay to $55,000 in April and then to $60,000 as soon as they could get permission. So they were going to raise it anyway. They recognized that she was underpaid. But they used that complaint. She was very upset. They agreed that she was underpaid, and so they agreed to raise her pay at that time. But it wasn't because they concluded that she was discriminated against based on her sex or her age. Turning to the later part, why did they believe her, not believe her, and believe the other employees? And remember, there aren't two. There are three other employees who saw her participate in this call. There was Ms. Suppe, there was Ms. Aguiar, and there was Ms. Castleberry. All three of those employees said that she was present during the call. And the people who did the investigation believed that those employees were credible witnesses. They initially denied being that she was present or that they'd even made the call. The company got the phone records, found out that the calls were made. Two of the women came forward and said, we lied, we were present, and the plaintiff, Ms. Samuels, was present too. They had no reason to implicate her in this conspiracy. There was no evidence that they were trying to implicate her when she was not there. The company concluded that she had been present, three witnesses said that she was present, a witness said that she had tried to get them to lie, that she told everybody, let's not tell anybody about this. If we tell anyone, we'll all get fired. And that was the reason that the company decided to let her go, because she was there, she never fessed up that she was there, and the other people did fess up, and that she had told her two subordinates that they should lie, should cover it up, should not tell that they were there in the call, because they'd get fired. So yes, she was treated more harshly than the other two employees. The other employees got written warnings, told that if anything bad happened again, they were going to be fired, and she was let go. But there were reasons why she was treated more harshly. She was the second most senior person at the branch, she was a very senior employee there. She was the one that the company concluded that she was the one who had told her coworkers to lie, and that was not true of the other two employees. And she was the one that never came through with the truth. In fact, Mr. Lavoie said that he would have, if she had finally come through with the truth, he would have thought more seriously about whether she should be terminated or not. But the fact that she consistently lied, never came through with the truth, tried to get her other employees to lie, and that she was a senior person, all made him believe that he would have to let her go. And I don't think that anybody can really dispute that that was the right discipline, at least I certainly don't, for someone like that. You can't have employees at your branch who lie about their participation. I mean, first of all, she should never have been participating in the call, particularly given she was a senior manager there. But even beyond that, you just can't have people who lie and who try to encourage their subordinates to lie. I think that the key thing in this case is that a complaint of discrimination does not excuse an employee from discipline for that employee's misconduct. The employee cannot commit misconduct and then seek to avoid the consequences of that misconduct  If an employee is accused of misconduct, that manager must have the right to investigate that misconduct. And if the manager concludes that the misconduct occurred, then the manager has the right to discipline, including terminate, the employee, even though the employee had previously complained of discrimination. Even if the manager knew about that complaint, even if the employee had been a great employee for 11 years, even with all those things are true, the employer still has the right to discipline an employee for the misconduct. Well, that's really not the question. We know that. The question is, is there enough here so that the jury could decide in favor of your client or in favor of the other client? That's the only issue. Is this one that is so clear that it should have been summary judgment, no chance for different inferences? And I believe, and the district court believed, that this is that clear of a case, that simply because she had complained three months earlier of discrimination and got the pay raise did not create a sufficient inference, because that inference from that prior complaint that was broken by her own misconduct. Suppose, for example, the employee complains to her boss of discrimination on one day, says, I've been discriminated against based on my sex. The next day, the employee comes into work and punches a coworker or embezzles money or is selling drugs at work, whatever the misconduct is. The company clearly has the right to discipline, in fact terminate, that employee for the misconduct, even though the employee, employer knew about the complaint, it was the same actor involved, and even if the employee had been working there for years and years. So the only evidence that the plaintiff is presenting, the appellant is presenting, as inference, as evidence that creates this inference, is the same actor, temporal proximity, and the fact that she was a long-term employee. But even though in some cases those can create an inference by themselves or together, in this case they don't, because the employee by her own misconduct broke that chain. If anything, temporal proximity favors my client. She committed the misconduct on a Thursday, and by Monday they've completed the investigation and have decided to let her go. And so it's more likely that the temporal proximity is that she was let go for the misconduct, and that is what all the evidence in this case was. There was no evidence at all that she was let go for any reason other than the misconduct that took place. In order to conclude that you need. The other three employees said that she was there when the phone call was made. Correct. And one of the employees said that she had called that employee and said, let's not tell anybody about this. We'll all get fired if we do. If we stick together as a group and don't spill the beans, then we'll be safe. The company concluded that that had happened and that it was inappropriate. What did she say about that? She denied it. She denied it. Right. But remember, there are all those cases that say that just because the employee denies the misconduct, that doesn't create a disputed issue of fact. To look at Goss versus Bechtel in California, and there are Ninth Circuit cases, too, that say those same things, that simply because the employee denies the misconduct, that does not create any kind of inference of dispute. She said she didn't make the call. She said she was not at the call, correct. She said she didn't make the call. That she wasn't present when the call was made. She wasn't present when the call was made. Right. And three witnesses, Castleberry, Aguiar, and Suppe, said she was present. And one of the things that she called them. Whose idea was to make the call? There's a question. I agree there's a disputed issue about that. Three people said that it was her idea. She said, let's call. And then the one witness who wasn't interviewed, Ms. Schutt, said that it was Clara Aguiar's idea to make the call. But that wasn't the factor that led to the termination. Well, I know that wasn't the factor. I just wanted to know what the evidence was. Yeah. The evidence is the evidence that the company had at the time was that she was the one that instigated the call. She said, let's call. Let's see what happens. Maybe Michael Douglas will pick up. And what would we do if Michael Douglas picked up? And we'd swoon and all of that type of stuff. The evidence that the company had was that she was the one that made that call. Later, this woman, Ms. Schutt, who gave a deposition in the case, she said, yes, the plaintiff was present when the call was made. So Ms. Schutt does not support the plaintiff's version of events as is argued in the brief. Ms. Schutt said the plaintiff was present when the call was made, but Ms. Schutt said that it was Clara Aguiar who said, let's call. The other witnesses said it was the plaintiff who said, let's call. But, again, whether the plaintiff denies it or not is not the issue. Remember, Guz versus Bechtel and Collings. What did Michael Douglas say? Unfortunately, it was not him. It was his production company or a production company. And the person who called just said, who's this? And the person on the other end of the line said, it's a production company. And then they hung up the phone. Big deal. Yeah. So how did the company find out about that? I don't know that Michael Douglas ever found out about this. But UBS found out because this Mary Jane Castleberry overheard it. And she told the broker who had brought Catherine Zeta-Jones in as a client to UBS and told her, look, these people have called the emergency number for Catherine Zeta-Jones, which is supposed to be Michael Douglas's number, and I don't think that's right. And I think we can all agree that, you know, it really jeopardized UBS's relationship. It would jeopardize, could jeopardize UBS's relationship with important celebrity clients if their own employees are calling the emergency contact number for the clients. It turned out it wasn't Michael Douglas's number. But that wasn't the point. They violated the rules that they knew about. Did the person who answered the phone call at that Michael Douglas's place know that UBS had called? No, I don't believe that there was no evidence to suggest that at all. It was simply UBS's belief that these people were improper in making the call in the first place, whether or not the call went through to Michael Douglas himself or his production company. Well, how did this woman who brought in that business know that that call had been made? Because Mary Jane Castleberry, Mary Jo Castleberry, Mary Jo Castleberry was also overheard the call. She was one of the three witnesses. Remember, the call was on the speakerphone. And so Mary Jo Castleberry overheard the call, and she told Dan Schwaler, I think that's how you pronounce it, who was the broker who had brought in the Catherine heard the three women at the office calling who they thought was Michael Douglas because they got his phone number off the emergency contact information. Dan Schwaler got upset that people were trying to call his client and told the branch manager. And that's what led to the investigation that led to the termination. But remember, she wasn't terminated just because she was present in the call. The other two people were present in the call. They were just as guilty of her as her on that. But they fessed up to it, and she never did. And they didn't agree. She was the supervisor. She was the senior employee, and she's the one that told them to lie during the investigation. And that was the really egregious conduct that she did. And she said she didn't tell them to lie. Correct. But obviously, as I say, the company doesn't have to be right. And the cases are absolutely clear that the decision doesn't have to be right. But does it create an inference of discrimination or retaliation? I remember there was a case where a guy was accused of using drugs at work. And he came in and he denied he used drugs at work. And the company concluded that he had, and they fired him for it. And he sued and claimed, I forget, I think discrimination. And the Ninth Circuit upheld that decision, that he was not retaliated against or discriminated against, even though he had complained. And he denied that he engaged in the misconduct. Because, again, companies have to be free to conduct their own investigations to reach a conclusion, right or wrong, as long as they reach a conclusion that doesn't create an inference of retaliation. And here I think the evidence is clear that it reached its conclusion based on the evidence that was presented to it that she had engaged in this misconduct, whether she did or not. And there was no inference that they disciplined her because of some complaints she'd made three months earlier about not being paid enough or even because of the letter that was delivered on the day of her termination. Okay. Anything else I can help? I have a question. Yes. Your opponent is saying that the knowledge of Mr. Haberson about the prior complaint can be imputed to Mr. LaVoies. And he cited a California Supreme Court case for that proposition in his reply brief. What is your response to that, since obviously you didn't get a chance to respond to the reply brief? Right. I think that we have the Cohen case, which is, I think it was the Cohen case, that's pretty clear that you don't impute knowledge from one person to another person, and it has to be the actual decision-maker that is the one that has the knowledge. But I agree with Judge Bright that that is not the be-all and end-all of this case, and that's not going to – my case is not going to turn on this imputed knowledge. I think it's much more important to look at whether there were any inferences that could be drawn that she was fired because she had complained. And I just think the evidence is so clear, as the district court found, that there are no inferences to be drawn whether it was the same actor or not, whether he knew of the complaint or not, whether she was a good employee or not. There still isn't enough evidence to create an inference that she was fired because she had complained as opposed to being fired because of her own misconduct. Thank you very much. Thank you. If I may reply briefly, Your Honors. We agree that it's not a – it's all right to terminate an employee for misconduct. However, it is not okay to terminate an employee for complaints of discrimination. What UBS's motive was in this case is not a question to be determined by this Court on summary judgment. It is a question for the jury to determine after trial. The evidence – Only if you show pretext. If we show pretext, Your Honor. And in addition to the three factors establishing the causal connection of proximity, decision-maker, and prior performance, we have additional evidence to show pretext of both the sham nature of the investigation itself and the disproportionate discipline imposed on the other employees. What's disproportionate about firing a supervisor employee for misconduct? The conduct was the same, Your Honor. They both participated. That's true. I agree with that. Okay. But this is a supervisor who is supposed to set an example. Isn't that true? Isn't that what supervisors are supposed to do, be mentors? Correct, Your Honor. But it's still – it was unequal whether or not it was a – they have a reason for it. They say, okay, we fired her instead of the others because she was a supervisor. I haven't heard that. I haven't heard them say we decided to fire her because she was a supervisor. They're saying that they decided to fire her because she lied. Well, the other employees lied as well, Your Honor. They fessed up, so to speak. What they did is they implicated my client, Ms. Samuels. But in the record itself – Well, we mitigate punishment as judges all the time for people who finally come forward with the truth. She did not. We don't know if she did or not, Your Honor. We don't know what the truth is. That's for the jury to determine. She's saying she didn't. We also have a witness that was not even interviewed saying that it was Aguirre who instigated the phone call. We also have Aguirre saying that Castleberry, the other supposed independent witness, was her, quote, best bud and would back up anything Aguirre had to say. That's in the excerpts of record at pages 335, 698 to 699. So there's a question whether or not this was not these subordinate employees getting together and saying, we're in trouble here, let's pin it on Samuels. Samuels maintains that she did not participate in this phone call. Well, how would that demonstrate pretext by the company or Mr. LaVoie's? That it was a trumped-up investigation, that there was no – that they were looking for – You just said it was the lesser employees who decided to do that. That's one inference that could be drawn. They go in and they say, okay, we're just going to pin it on Samuels. That doesn't mean that what Samuels – How can you attribute that to the decision-maker? The fact that they did not interview all the witnesses, that they were just really looking for the evidence that they wanted to get rid of Samuels. That they didn't even interview this other employee, Shute, who backed up at least a portion of Samuels' testimony that she was not involved. Failure to interview that person demonstrates that it was a trumped-up investigation. Is that your argument? Correct. It is evidence, it's circumstantial evidence that it was a trumped-up investigation. That's pretty far-fetched to say the investigation was trumped-up. The question that I have is a question along – suppose that her prior complaint entered into it. What's the standard? I mean, does it have to be a motivating factor or a substantial factor? That's the key word. It's a motivating factor, Your Honor. Pardon me? Motivating factor, Your Honor. So if it is not the motivating factor, that means on retaliation that has to be the real factor. If it's 40 percent retaliation and 60 percent because she was lied, you lose then. No. It's not my article was improper. It's a motivating factor, Your Honor, not the – A, so it is a – as long as it enters into it. Correct. Okay. It's a mixed motive. I thought you said D. No. I apologize if I misspoke, Your Honor. All right. Thank you. I have nothing further to say. Okay. Thanks. The matter will stand submitted.
judges: Bright , Pregerson, Alarcon.